David Hilton Wise, Esq.
Nevada State Bar No. 11014
**WISE LAW FIRM, PLC**
335 W 1st Street
Reno, Nevada 89503
Telephone: (775) 299-4284
Facsimile: (703) 934-6379
Email: dwise@wiselaw.pro

Alexandr Rudenco, Esq.*
**MILBERG, PLLC**
800 S. Gay St, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

Counsel for Plaintiff and the Prospective Class

*Pro Hac Vice Forthcoming*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **MIROSLAV VITEK,**<br>　　**Individually and on behalf of the Boyd Gaming Corporation 401(k) Plan and Trust, and on behalf of all the similarly situated participants and beneficiaries of the plan,**<br><br>　　　　**Plaintiff,**<br><br>　　v.<br><br>**BOYD GAMING CORPORATION; BOYD GAMING CORPORATION 401(k) PLAN AND TRUST COMMITTEE; John and Jane Does 1-30 in their capacities as fiduciaries and members of the Committee,**<br><br>　　　　**Defendants.** | **Case No. 2:26-cv-404**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

1.　　Plaintiff Miroslav Vitek, individually, and on behalf of all other similarly situated

1

participants, their beneficiaries and estates, and on behalf of the Boyd Gaming Corporation 401(k) Plan and Trust ("the Plan"), brings this action under 29 U.S.C. §§ 1132(a)(2) and (3) against Defendants (1) Boyd Gaming Corporation ("Boyd Gaming"), (2) Boyd Gaming Corporation 401(k) Plan and Trust Committee ("Committee"), and (3) John and Jane Does 1-30 in their capacities as fiduciaries and members of the Committee (collectively, "Defendants" or "Fiduciaries"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001, *et seq*.

2.      Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, defined contribution plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3.      As fiduciaries to the Plan, Defendants were obligated at all times to act (1) prudently and (2) for the exclusive benefit of participants and beneficiaries. Defendants violated their fiduciary duties by both (1) initially selecting; and (2) consistently retaining the American Century Target Date Fund for more than eight years, even when it glaringly underperformed under all investment metrics and, consequently, in terms of returns. This lower-performing investment option reduced Plan participants' retirement funds by millions of dollars as compared to if Defendants did not breach their fiduciary duties.

4.    Plaintiff brings this action to obtain the relief provided under 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below, and for other appropriate equitable and injunctive relief under 29 U.S.C. § 1132(a)(3).

## II. JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

6.    Venue is proper in this judicial district pursuant to 29 U.S.C. § 1132(e)(2) because Defendant Boyd Gaming resides in this District.

## III. THE PLAN

7.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

8.    The Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through the sum of employee and employer contributions and associated investment earnings minus associated expenses.

9.    The Plan is a defined contribution plan covering all eligible employees of Boyd Gaming and participating subsidiaries. Participants of the Plan can elect to make tax-deferred contributions upon eligibility.

10.    The Defendants control and manage the operation and administration of the Plan. The Defendants have fiduciary responsibility for the investment of the assets of the Plan.

11.    The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

12.     At all relevant times throughout the Class Period[1], the Plan was larger than 99% of all defined contribution plans and was considered a large plan, such that Plan fiduciaries should have had significant leverage to negotiate the lowest fee rates for investments. The Plan Sponsor managed over $400 million in Plan assets from 2020 to 2024 for over 15,000 active participants depending on the year.

### IV. THE PARTIES

13.     At relevant times, Plaintiff Miroslav Vitek, by virtue of his former employment with Boyd Gaming and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches of fiduciary duty and ERISA violations.

14.     Thus, Plaintiff Vitek is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

15.     At relevant times during the Class Period, Plaintiff Vitek was invested in the American Century One Choice target date fund series.

16.     As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff Vitek was subject to underperformance and suffered financial losses.

17.     At all relevant times, Defendant Boyd Gaming Corporation, was and is incorporated in Nevada with its principal office located at 6465 S. Rainbow Boulevard, Las Vegas, Nevada. Boyd Gaming is a company with over 20,000 employees.

18.     At all relevant times Boyd Gaming was and is the named fiduciary and sponsor of the Plan per 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1002(a); a party in interest under 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it appointed

---

[1] Six years prior to the filing of this complaint.

members of the Committee and fiduciaries and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

19.    At all relevant times, one or more of the Defendants was the Plan administrator under 29 U.S.C. § 1002(16); a party in interest under 29 U.S.C. § 1002(14)(A); and Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets, as well as a named fiduciary.

20.    At all relevant times, Defendants John and Jane Does 1-30, as fiduciaries and members of the Committee, were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiff will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery.

21.    Boyd Gaming, the Committee, and John and Jane Does 1-30 are hereinafter referred to as the "Defendants" or "Fiduciaries".

### V. DEFENDANTS' FIDUCIARY OBLIGATIONS

22.    ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Defendants' selection and retention of investment options for the Plan.

23.    ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). Accordingly, **fiduciaries must vigorously and independently investigate each of the Plan's investment options with the skill of a prudent investor.**

5

24.     As part of its fiduciary duty, the Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If an investment is imprudent, Boyd Gaming "must dispose of it within a reasonable time." *Id*. (citation omitted).

25.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that: In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

26.     Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part: Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach,

6

and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI. FACTUAL ALLEGATIONS

### A. Defendants Violated ERISA's Fiduciary Duty of Prudence.

#### a. Background on Target Date Funds

27. In a recent report to Congress, the U.S. Government Accountability Office ("GAO") noted that Target date funds (TDFs) are widely offered and have become the most popular investment option used by 401(k) plan participants. TDFs allocate assets over time based on participants' targeted retirement dates. Plan sponsors often choose TDFs as their default investment because TDFs offer a "set it and forget it" option for participants.

28. The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." For example, funds in a target date fund series for plan participants expected to retire around 2040 would typically be referred to as the 2040 vintage of that series while the fund in a target date fund series for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage target for that specific target date fund series.

29.     American Century Investments ("AC") is an investment management company that created and manages the American Century One Choice target date fund series (hereafter "AC TDF"). Like most target-date fund series, the AC TDF is structured as a "fund of funds," which means that each vintage invests in other American Century proprietary funds rather than individual securities. For example, each vintage in the AC TDF may be invested in differing proportions of proprietary AC equity funds, bond funds, real estate funds, and money market funds. In other words, each vintage of the AC TDF invests in a combination of proprietary AC mutual funds to provide varying exposure to a mix of asset classes such as U.S. stocks (large-caps and small-caps), international stocks, U.S. bonds, international bonds, investments linked to real estate, and cash-equivalent securities.

30.     Each equity allocation is intended to provide exposure to a specific market segment. Typically, those segments include U.S. large-, mid- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market.

31.     The fixed income allocation is intended to provide diversified exposure across a wide range of market sectors, including U.S. government obligations, corporate investment grade and below investment grade bonds (commonly known as "high yield bonds" or "junk bonds"), other U.S. aggregate bond sectors (including mortgage- and asset backed securities), and emerging market and international fixed income issues. The portfolio manager's aim is to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer diversification and liquidity.

32.     Under ERISA, the asset allocation for each vintage of a target date fund series is required to be consistent with the prudent investor standard which incorporates Modern Portfolio Theory.

33.     TDFs seek to achieve their objectives by rebalancing assets over time to become less focused on growth (lowering their allocation to stocks) and more focused on preservation (raising their allocation to bonds) as the fund approaches and passes the target date. The asset mix between equity and fixed income shifts dynamically over time, becoming less risky over a person's working career and into retirement. The transition from higher risk to lower risk is often referred to as the "glide path."

34.     For example, the following graph illustrates Morningstar's calculation of the average glide path over time from 2010 to 2024.



Morningstar Manager Research | 24

EVOLUTION OF THE ASSET ALLOCATION GLIDE PATH

## Asset Allocation Glide Paths Have Become More Aggressive.

The average allocation to equities in the target-date universe has generally increased over the past 15 years across the glide path. Some factors that have played into this trend include:

- **Interest rates:** Low interest rates for much of the 2010s and early 2020s dampened bond yields and made them less attractive relative to stocks, which tend to thrive in low-rate environments.
- **Growth potential:** Equities should provide greater growth potential over longer periods compared with bonds. Higher allocations are suitable for younger investors, who can take on more risk and benefit from longer periods of growth and the effects of compounding.
- **Life expectancy:** While life expectancy in the US took a dip during the coronavirus pandemic, it has generally risen over time, meaning people are more at risk of outliving their assets. Equities should provide greater growth potential over longer periods compared with bonds.

Source: Morningstar Direct. Data as of Dec. 31, 2024.     See Important Disclosures at the end of this report.

[2]

35.     TDF glide paths are often categorized as managed either "to" or "through" retirement. In general, historically a "to retirement" glide path generally assumed participants withdraw their funds once they reach the presumed retirement age, or soon thereafter, and tend to have less equity exposure at retirement. Similarly, in general, the asset allocation of a "to retirement" TDF historically remained static once the retirement date is reached. A "through retirement" glide path generally expects participants will remain invested after reaching retirement and gradually draw down on their funds. Accordingly, the terminal allocation of a "through" TDF is not reached until a predetermined number of years after the target date.

---

[2] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 24.

10

36.     However, these distinctions and categorizations are somewhat arbitrary. In fact, for example, some "to" glide paths, like the AC TDF series, have more equity exposure at retirement than some "through" glide paths. Moreover, as illustrated in the Morningstar's graph above, over time most retirement plan asset managers have understood that, under the circumstances prevailing prior to and at the start of the Class Period as well as now, static asset allocations for plan participants around age 65 are less consistent with Modern Portfolio Theory.

37.     Further, while TDFs are sometimes considered differentiated by whether they consist of index (passive) funds or active funds, in fact all TDFs are actively managed because of the continuous work of shifting the asset allocation of each vintage along the glide path.

38.     Accordingly, as described below in more detail, the minimum standard of care for prudent plan fiduciaries making investment decisions under the prudent investor standard requires a consideration of more than just a "passive" or "to" subset of the available universe when selecting or monitoring target date fund series.

39.     Additionally, while the specific details of glide paths vary somewhat across different TDF series, they are all constrained by Modern Portfolio Theory and, as a result, they all compete with each other for investment dollars. Over the years, it has become clear that some glide paths are better than others. This is illustrated by the change in the average glide path illustrated above as well as net fund flows out of inferior glide paths and into superior glide paths.

40.     Further, because most plan fiduciaries designate the selected TDF as the qualified default investment alternative ("QDIA") under ERISA, the TDF selected by a plan fiduciary will typically contain the lion's share of the assets of most plan participants. For this reason, the selection of a TDF series as the QDIA by plan fiduciaries is often the most important and impactful of all its investment selection and monitoring responsibilities.

41.    For example, in this case the AC TDF comprised over 30% of the Plan's assets from 2020 through 2024.

42.    Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2024, there were only 37 established TDFs that had a 15-year track record. A closer look reveals that the space is even more concentrated with the Vanguard TDF series having more than double the assets of the next largest TDF series. Moreover, as of the end of 2024, the top 5 largest TDFs have garnered more than 80% of the dollars invested in TDFs.



**Mutual Fund + CIT Assets TD Market Share**

| | |
|---|---|
| ○ Vanguard | 36.97% |
| ○ Fidelity | 13.89% |
| ○ T. Rowe Price | 11.46% |
| ○ BlackRock | 9.82% |
| ○ Capital Group | 8.48% |
| ○ Remaining TDFs | 19.38% |

Source: Morningstar Direct and surveyed data. Data as of Dec. 31, 2024.

[3]

---

[3] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 13.

43.     The significant market share among the market leaders is primarily the result of investors moving away from clearly inferior TDF products, like the AC TDF chosen by Defendants in this case, and into superior alternatives. The net flow into a particular target date series is the sum of contributions from existing investors, withdrawals from existing investors, and the net result of transfers by fiduciaries from one inferior target date series to a new superior target date series. Investors and plan fiduciaries have been making decisions that indicate they have concluded that the AC TDF is inferior. For instance, in 2024 the AC TDF series experienced net outflows of almost $4B. This represented a loss of more than 19% of its total assets under management. In contrast, for example, the American Funds/Capital Group target date series experienced over $16B in net inflows.

44.     As noted above, all TDFs compete for selection by plan fiduciaries and are compared against each other despite some slight differences in glide paths. Unlike the mutual fund market, the TDF market is too small and concentrated for plan fiduciaries to fail to compare their selected options against the market leading and established available options. In other words, while there are some differences between, e.g., the T. Rowe Price and Vanguard TDFs, prudent fiduciaries compare and consider these two as well as other options when making their selections and deciding whether to retain or remove a selected TDF series. Further, over time as prudent fiduciaries have continued to evaluate and analyze the differences in the glide paths of TDF series, the superior glide paths have attracted more assets and most TDFs with underperforming glide paths have revised their glide paths to be more like the superior options. In other words, over time the variance between the glide paths of the TDF series have decreased and those that continue to be outliers have experienced underperformance.

**b. The Standard of Care for Prudent Fiduciaries Selecting and Retaining a TDF Series**

45.     ERISA's fiduciary duty of prudence requires that fiduciaries must act consistent with the prudent investor standard when making decisions related to plan investments. This means that in order to be prudent, fiduciaries are required to follow accepted investment theories and prevailing investment industry practices. *Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015). For the last several decades, the most accepted investment theory is the Modern Portfolio Theory ("MPT") which has been incorporated into the prudent investor standard.

46.     A prudent TDF selection and monitoring process considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential TDF series.

47.     A prudent process considers all the metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the TDF should be selected or retained.

48.     Accordingly, the minimum standard of care for prudent plan fiduciaries selecting and retaining investment options to be made available for plan participants always requires an analysis of the risk-adjusted performance of the selected or retained investment options.

49.     While the selection of a target date series is a bit more complex than the selection of a single-strategy investment option, retirement plan experts have also developed a minimum standard of care with respect to the selection and retention of target date series.

50.     The most critical criteria for selecting and retaining target date fund series are performance, risk (which incorporates risk-adjusted performance), fees, and the "glide path" dynamic asset allocation (also sometimes called "portfolio construction"). These quantitative criteria are also supplemented with some qualitative criteria that are often merely proxies for an

increased risk of future underperformance, e.g., a change in the investment manager's ownership or key personnel, a shift in the investment manager's philosophy or process, or the investment manager's involvement in litigation or fraud allegations.[4]

51.    In other words, the qualitative criteria primarily provide reasons to not select (or eliminate) a TDF series from a plan even if performance was good at that moment. At the end of the day, however, risk-adjusted performance is the primary and most important criteria. Even the fees are essentially a proxy for performance because lower fees correlate with higher performance.

52.    And of course, the actual performance of an investment is the most important criteria to the investor (plan participant) and is accordingly always considered when evaluating a target date series. And because each target date series might incorporate a glide-path that takes on relatively more (or less) risk, the risk-adjusted performance metrics are relatively more important for comparing and benchmarking target date series.

53.    As discussed above, when evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries requires the incorporation of standard metrics from MPT. The most important of these criteria include, but are not limited to, the following metrics over three- and five-year trailing periods:

- Alpha: "A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict.

---

[4] See, the United States Government Accountability Office Report to Congressional Requesters, "401(k) Retirement Plans" March 2024, Accessible Version, page 50 of the Report (page 56 of the pdf). See also, CAPTRUST's "Best Practices for Target Date Fund Selection, https://www.captrust.com/wp-content/uploads/2019/05/tdftips.pdf (last accessed January 20, 2026); Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta."

- Sharpe Ratio: "A risk-adjusted returns measure developed by William Sharpe. It is calculated over each [time] period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate."[5]

- Sortino Ratio: "Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator."[6]

54. Some other relevant metrics include the following:

- Information ratio (IR): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared

---

[5] Notably, American Century identifies the Sharpe Ratio is a meaningful investment metric in its marketing materials. See https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last viewed January 21, 2026).

[6] United States Government Accountability Office Report to Congressional Requesters, "401(k) Retirement Plans" March 2024, Accessible Version, page 70-71 of the Report (76-77 of the pdf).

16

to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.

- Batting Average ("BA"): is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who beats the market half of the time would have a batting average of .500.

- Turnover Ratio: is the percentage of a mutual fund or other portfolio holdings that have been replaced in the course of one year. Since a fund with a higher turnover ratio will have higher trading fees and short-term capital gains taxes, a portfolio manager with a higher turnover ratio will need to ensure that those trades are generating positive returns in excess of the additional costs

55.     Additionally, the minimum standard of care for prudent plan fiduciaries selecting and retaining target date series requires a comparison of the risk-adjusted performance. In other words, to satisfy the minimum standard of care under the circumstances then prevailing both prior to and throughout the Class Period, a prudent fiduciary should have considered peer comparison.[7]

56.     Accordingly, a prudent plan fiduciary, when determining whether to retain a Target Date Fund series, would evaluate and compare the performance and commonly accepted investment performance metrics such as the ones identified above to meaningful benchmarks including at the very minimum the industry leading peer alternative target date options.

---

[7] See, Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

17

57.     Prior to and throughout the Class Period prudent plan fiduciaries had access to a tremendous amount of information to evaluate the performance of the AC TDF series in comparison to the industry leading alternative options.

58.     Additionally, the prudent evaluation process requires an evaluation of all various "preferences" with respect to various target date fund series. In other words, the selection of a "through" versus a "to" TDF series or an "active" versus a "passive" TDF series is a fiduciary decision in and of itself. Similarly, the selection of a TDF series incorporates and requires the selection of the glide path of that TDF series which is also a separate fiduciary decision in and of itself. Arbitrary limitation to only consider "to" or "through" options, or only "active" and not "passive" is imprudent.

59.     For instance, hypothetically, if all "passive" TDF series consistently underperformed all "active" TDF series then it would be imprudent to limit the selection process to "passive" options because there may be something inherently imprudent in the universe of "passive" options. The same goes for choosing a "to" TDF series versus a "through" TDF series. Moreover, there is a lot of overlap in the glide paths of "to" versus "through" glide paths and since many of the categorizations are arbitrary, a prudent fiduciary would consider the entire universe of TDFs as opposed to a limited subset.

60.     Accordingly, a prudent plan fiduciary is required to evaluate not only whether a particular preference is prudent under the circumstances then prevailing but also whether specific options that incorporate or do not incorporate those preferences are prudent. In other words, a prudent plan fiduciary would be required to conduct an evaluation of the differences between various preferences to determine and ensure that those preferences were, in fact, prudent.

61.    Practically speaking, prior to and throughout the Class Period, in this market with limited options, a prudent plan fiduciary would always consider and compare, at a minimum, the Capital Group Target Retirement Series (also known as "American Funds"), the Vanguard Target Retirement Series, the T. Rowe Price Target Series, and the BlackRock LifePath Index series with any other potential TDF series because these have consistently outperformed most alternatives when evaluated by prudent MPT process and are accordingly, among the most often selected TDF options. See supra, Paragraph 43.

   c.  **Defendants' Failure to Follow a Prudent Process in Retaining the AC TDF Series**

62.    Defendants retained the AC TDFs from 2018 through at least the end of 2024.

63.    Defendants retained the AC TDFs despite readily available then prevailing information (available both prior to and throughout the Class Period) which indicated dramatically inferior performance, worse performance on investment manager metrics, and lower performance in risk adjusted metrics.

64.    In other words, examining the information available to the Fiduciaries in 2020, a fiduciary following the minimum standard of care for prudent investors, when evaluating whether to continue to retain the AC TDF series would have determined that its investment performance was inferior, its risk-adjusted performance was inferior, and that its glide path and investment philosophy were being rejected by the data and the market, and thus removed the AC TDF by early 2020, at the latest.

65.    For example, for several years prior to and continuing throughout the Class Period, the AC TDF has consistently underperformed other prudent target date series options and the alternatives that AC used as a benchmark themselves.[8]

66.    Specifically, under the circumstances prevailing in 2020, when confronted with the information that the AC TDF at the end of 2018 and 2019 had consistently underperformed in 3- and 5-year returns and MPT manager, risk, and cost metrics, a prudent fiduciary following the standard of care for prudent investors would not have decided to continue to retain the AC TDF throughout 2020.

67.    The table below provides a summary of 3- and 5-year investment returns and metrics underperformance compared to industry leading available alternative target date series (described in more detail below) in 2018 and 2019. In both years, the 3- and 5-year underperformance of the AC TDF series was around 98% of the available time periods compared within those years, which shows that the AC TDF had a consistent more than five-year underperformance by the end of 2019 across all metrics (just prior to the start of the Class Period).

---

[8] It is worth noting that for some period of time prior to and at least through October 7, 2024, AC compared their TDF series to the American Funds TDF in their marketing materials on their website. As of January 21, 2026, however, they have removed that comparison and now compare to a Fidelity series.  See, https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last viewed January 21, 2026).

**Performance Metrics Comparison Summary January 2018 - December 2019**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics AC Underperformed | Percentage of Metrics AC Underperformed |
|---|---|---|---|
| 3 - Year Return | 55 | 55 | 100% |
| 5 - Year Return | 48 | 48 | 100% |
| Sharpe Ratio - 3 - Year | 55 | 55 | 100% |
| Sharpe Ratio - 5 - Year | 48 | 48 | 100% |
| Information Ratio 3 - Year | 55 | 55 | 100% |
| Information Ratio 5 - Year | 48 | 48 | 100% |
| Alpha 3 - Year | 55 | 55 | 100% |
| Alpha 5 - Year | 48 | 48 | 100% |
| Sortino Ratio - 3 - Year | 55 | 55 | 100% |
| Sortino Ratio - 5 - Year | 48 | 48 | 100% |
| Batting Average 3 - Year | 55 | 54 | 98% |
| Batting Average 5 - Year | 48 | 47 | 98% |
| Turnover Ratio | 56 | 46 | 82% |
| **Total** | 674 | 662 | 98% |

68.    Given the underperformance of 662 out of 674 metrics (98%) examining 3- and 5-year lookbacks, the Fiduciaries had no reason to expect the AC TDF to improve or outperform during the Class Period starting in 2020. Unsurprisingly, failure to remove the AC TDF in 2020 based on this information resulted in millions of dollars of harm to the Plan.

**Approximate Performance Losses January 2020 - December 2024**

| Target Date Series Name | AC's Approximate Performance Losses ($) vs. Comparators |
|---|---|
| American Funds Target Date Retirement Series R4/R6 | -$16,801,339 |
| Vanguard Target Retirement Series Inv/Trust II | -$10,815,261 |
| T. Rowe Price Target Series Inv/Ret Trust A | -$11,218,652 |
| BlackRock LifePath Index Instl/Trust T | -$9,283,622 |

21

69.     A prudent fiduciary following the standard of care under the circumstances then prevailing in 2020 (examining 2018 and 2019 3- and 5-year lookback data) would have evaluated the AC TDF series against, at a minimum, the investable market leading TDF benchmarks identified above, under the MPT accepted investment metrics set forth below and, regardless of which combination of reasonable benchmarks and metrics chosen, a fiduciary acting under the prudent investor standard under the circumstances then prevailing in 2020, **could not have concluded that it was prudent to continue to retain the AC TDF series** unless they employed a flawed process.

70.     Similarly, the table below illustrates that the details of the AC TDF series underperformance[9] when evaluated using several investment metrics that are commonly used, accepted, and required by MPT and the Prudent Investor Standard. Using these commonly accepted and required metrics for comparison demonstrates that a prudent process would have revealed that the AC TDF series consistently underperformed under all metrics, removed it in early 2020, and avoided the harm caused to the Plan.

71.     A prudent process would have also removed the AC TDF prior to the Class Period, but at the latest, and more relevant to this action, in 2020. Every single following quarter that the Fiduciaries failed to remove this option was a result of imprudence because the AC TDF series underperformed a shocking 98% of commonly accepted MPT metrics of 3- and 5-year lookbacks in 2020[10].

---

[9] "Underperformance" in this context includes both commonly accepted investment manager metrics as well as the investment returns.

[10] The most relevant available information back in 2020 was 2019 and 2018 lookback performance.

22

72.     In fact, by the end of 2018 it would have been evident to a prudent process that under the circumstances then prevailing, the available information revealed that across all categories of metrics, whether return/performance metrics, risk-adjusted performance metrics, fee metrics, and others, the AC TDF provided no advantages over its peers. In other words, as set forth below, the available data and information in 2020, requires an inference that the Plan Fiduciaries employed an imprudent process for several years.

73.     In 2020 the picture was no different when examining AC TDF past performance and thus prudent fiduciaries examining the AC TDF would have removed it in 2020.

74.     These facts also necessitate the further inference that regardless of whether Defendants weighed one category of MPT metrics over another, all available information at the time required them to remove the AC TDF and select a better performing TDF alternative.

75.     Nevertheless, from 2018 through 2024, Defendants failed to eliminate the AC TDF series from the plan which resulted in over 30% of the Plan assets being invested in the demonstrably underperforming and imprudent AC TDF until at least the end of 2024.

76.     Fiduciaries following a prudent process would not have ignored AC TDF's underperformance across all types of metrics as compared to better available options. This is further emphasized by the fact that **the comparator TDFs are established industry leaders**, and among the top 5 most selected options that any prudent fiduciary would be aware of and would compare their selected TDF against. In other words, Plaintiff did not cherry pick fringe or unproven peers for comparison.

77.     A prudent process would have uncovered AC TDF's poor performance against established peers.

78.     To make matters worse, as illustrated below, the AC TDF series was also more expensive in terms of fees, which is a significant consideration under the minimum standard of care prior to and throughout the Class Period. This means the Fiduciaries agreed to pay more for the AC TDF than they would have for better performing options that dramatically outperformed under all metrics. This is relevant because additional expenses need to be justified by a reasonable expectation of additional returns, which—given AC TDF's track record—was unreasonable to expect.

79.     Each table below illustrates an analysis of the several of the most important and commonly accepted investment performance metrics incorporated into the Prudent Investor Standard when comparing the AC TDF series to other available alternatives on an annual basis.

80.     In other words, each column of the table represents the circumstances at each calendar year end that the Plan Fiduciaries would have had available to them to compare the AC TDF series to meaningful and available alternative series had they employed a prudent process to determine whether to retain the AC TDF series.

81.     For each metric comparison, if the AC TDF series underperformed more than 50% of the time, the metric is highlighted in red. If the AC TDF series metric underperformed less than 50% of the time, the metric is highlighted in green and if the metric is unavailable it is left blank.

82.     As illustrated below, when compared on a TDF series-to-series basis, the AC TDF series underperformed the Capital American Target Date series under all metrics looking back 3- and 5-years. The chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics then available, they would have found that the AC TDF underperformed 100% of the time each year under each metric.

**American Century One Choice Series Inv vs American Funds Target Date Retirement Series R4: Percentage of Metrics AC Underperformed**

|  | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | 100% | 100% | 100% |
| Turnover Ratio | 100% | 100% | 100% |
| Net Expense Ratio | 100% | 100% | 100% |

83.    Similarly, when compared on a series-to-series basis, the AC TDF series underperformed the T. Rowe Price Target Date Series ("TRP") under all metrics 100% looking back 3- and 5-years, except Turnover. Thus, in 2020, a prudent process would conclude that AC TDF's advantage in Turnover costs is severely outweighed by dramatic 100% underperformance across all the other MPT metrics.

25

**American Century One Choice Series Inv vs T. Rowe Price Target Series Inv:**
**Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | 100% | 100% | 100% |
| Turnover Ratio | 0% | 71% | 36% |
| Net Expense Ratio | 100% | 100% | 100% |

84.    Likewise, the AC TDF series underperformed the Vanguard Target Retirement Series ("Vanguard") under all metrics looking back 3- and 5-years. The chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics, they would have found that AC TDF underperformed under all metrics with only two dipping below 100% underperformance (86% and 83% for 2019 BA).

26

**American Century One Choice Series Inv vs Vanguard Target Retirement Series Inv: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | 100% | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | 100% | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | 100% | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | 100% | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | 100% | 100% | 100% |
| Batting Average 3 - Year | 100% | 86% | 93% |
| Batting Average 5 - Year | 100% | 83% | 92% |
| Turnover Ratio | 100% | 100% | 100% |
| Net Expense Ratio | 100% | 100% | 100% |

85.     In that same vein, the AC TDF series underperformed the BlackRock LifePath Index Target Retirement Series ("BlackRock") under all metrics looking back 3- and 5-years. Here also, the chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics, they would have found an astonishing 100% underperformance across the board, except for slightly below 100% underperformance (86%) for 2018 Turnover Ratio.

**American Century One Choice Series Inv vs BlackRock LifePath Index Instl: Percentage of Metrics AC Underperformed**

|                          | 2018 | 2019 | Total 2018-2019 |
|--------------------------|------|------|-----------------|
| 3 - Year Return          | 100% | 100% | 100%            |
| 5 - Year Return          | 100% | 100% | 100%            |
| Sharpe Ratio - 3 - Year  | 100% | 100% | 100%            |
| Sharpe Ratio - 5 - Year  | 100% | 100% | 100%            |
| Information Ratio 3 - Year | 100% | 100% | 100%          |
| Information Ratio 5 - Year | 100% | 100% | 100%          |
| Alpha 3 - Year           | 100% | 100% | 100%            |
| Alpha 5 - Year           | 100% | 100% | 100%            |
| Sortino Ratio - 3 - Year | 100% | 100% | 100%            |
| Sortino Ratio - 5 - Year | 100% | 100% | 100%            |
| Batting Average 3 - Year | 100% | 100% | 100%            |
| Batting Average 5 - Year | 100% | 100% | 100%            |
| Turnover Ratio           | 86%  | 100% | 93%             |
| Net Expense Ratio        | 100% | 100% | 100%            |

86.     This dramatic level of underperformance compared to industry leading available alternatives, under the circumstances then prevailing in 2020, when considered holistically under accepted MPT metrics, would have mandated a prudent fiduciary to remove the AC TDF in 2020.

87.     In other words, prudent fiduciaries utilizing a prudent process incorporating commonly accepted performance evaluation metrics required by MPT would not have retained the AC TDF series in 2020.

88.     Ultimately a prudent process would have evaluated the retention of the selected AC TDF in relation to at least the available industry leading alternatives. Prudent comparison against industry leading TDF options leaves only one prudent choice: to remove the AC TDF in 2020 because it provided no advantages against available alternatives in 3- and 5-year lookbacks in multiple years. This raises the inference that Defendants did not employ a prudent process in monitoring their TDFs.

89.     Nonetheless, a prudent fiduciary would also conduct additional vintage to vintage analysis and found that vintage to vintage comparison also categorically supports removal of the AC TDF by 2020 at the latest.

**VINTAGE TO VINTAGE COMPARISON**

90.     The dramatic underperformance on the series-level would have instructed a prudent plan fiduciary to conduct additional analysis into the specific vintages/target years.

91.     While the results of the series-level comparisons make clear that conducting a vintage-to-vintage comparison would likely also reveal significant underperformance, the standard of care would require this analysis by vintage as well. [11]

92.     The tables below illustrate the results of the significant underperformance of each comparable vintage from 2020 through 2024 and the negative impact to the Plan's assets over that time period.

January 1, 2020 to December 31, 2024 – AC 2030 Approximate Performance vs. Comparable Funds

| Fund | Approximate Cumulative Return | Approximate Annualized Return | Growth of $24,689,271 | Difference |
|---|---|---|---|---|
| American Century One Choice 2030 Inv/Trust IV | 29.16% | 5.25% | $31,889,241 | $0 |
| American Funds 2030 Trgt Date Retire R4/R6 | 40.34% | 7.01% | $34,649,600 | -$2,760,359 |
| Vanguard Target Retirement 2030 Fund Inv/Trust II | 36.78% | 6.46% | $33,769,709 | -$1,880,469 |
| T. Rowe Price Target 2030 Inv/Ret Trust A | 36.74% | 6.46% | $33,760,370 | -$1,871,129 |
| BlackRock LifePath® Index 2030 Instl/Trust T | 31.96% | 5.70% | $32,580,156 | -$690,915 |

[11] See Exhibit A for detailed vintage to vintage comparison

29

**January 1, 2020 to December 31, 2024 – AC 2035 Approximate Performance vs. Comparable Funds**

| Fund | Approximate Cumulative Return | Approximate Annualized Return | Growth of $26,658,480 | Difference |
|---|---|---|---|---|
| American Century One Choice 2035 Inv/Trust IV | 31.98% | 5.71% | $35,183,234 | $0 |
| American Funds 2035 Trgt Date Retire R4/R6 | 48.83% | 8.28% | $39,675,139 | -$4,491,906 |
| Vanguard Target Retirement 2035 Fund Inv/Trust II | 41.75% | 7.23% | $37,787,873 | -$2,604,640 |
| T. Rowe Price Target 2035 Inv/Ret Trust A | 42.21% | 7.30% | $37,909,817 | -$2,726,583 |
| BlackRock LifePath® Index 2035 Instl/Trust T | 38.97% | 6.80% | $37,047,854 | -$1,864,621 |

**January 1, 2020 to December 31, 2024 – AC 2040 Approximate Performance vs. Comparable Funds**

| Fund | Approximate Cumulative Return | Approximate Annualized Return | Growth of $21,623,477 | Difference |
|---|---|---|---|---|
| American Century One Choice 2040 Inv/Trust IV | 34.96% | 6.18% | $29,182,372 | $0 |
| American Funds 2040 Trgt Date Retire R4/R6 | 55.60% | 9.24% | $33,645,303 | -$4,462,931 |
| Vanguard Target Retirement 2040 Fund Inv/Trust II | 46.71% | 7.97% | $31,723,339 | -$2,540,967 |
| T. Rowe Price Target 2040 Inv/Ret Trust A | 47.12% | 8.03% | $31,811,985 | -$2,629,612 |
| BlackRock LifePath® Index 2040 Instl/Trust T | 45.78% | 7.83% | $31,521,972 | -$2,339,600 |

**January 1, 2020 to December 31, 2024 – AC 2045 Approximate Performance vs. Comparable Funds**

| Fund | Approximate Cumulative Return | Approximate Annualized Return | Growth of $14,340,277 | Difference |
|---|---|---|---|---|
| American Century One Choice 2045 Inv/Trust IV | 38.61% | 6.75% | $19,877,422 | $0 |
| American Funds 2045 Trgt Date Retire R4/R6 | 57.03% | 9.44% | $22,518,293 | -$2,640,871 |
| Vanguard Target Retirement 2045 Fund Inv/Trust II | 51.94% | 8.73% | $21,788,603 | -$1,911,181 |
| T. Rowe Price Target 2045 Inv/Ret Trust A | 51.86% | 8.71% | $21,777,145 | -$1,899,723 |
| BlackRock LifePath® Index 2045 Instl/Trust T | 52.31% | 8.78% | $21,842,345 | -$1,964,923 |

**January 1, 2020 to December 31, 2024 – AC 2050 Approximate Performance vs. Comparable Funds**

| Fund | Approximate Cumulative Return | Approximate Annualized Return | Growth of $10,108,622 | Difference |
|---|---|---|---|---|
| American Century One Choice 2050 Inv/Trust IV | 42.58% | 7.35% | $14,413,031 | $0 |
| American Funds 2050 Trgt Date Retire R4/R6 | 57.41% | 9.50% | $15,912,055 | -$1,499,024 |
| Vanguard Target Retirement 2050 Fund Inv/Trust II | 54.19% | 9.05% | $15,586,128 | -$1,173,096 |
| T. Rowe Price Target 2050 Inv/Ret Trust A | 54.65% | 9.11% | $15,633,324 | -$1,220,293 |
| BlackRock LifePath® Index 2050 Instl/Trust T | 56.53% | 9.38% | $15,823,066 | -$1,410,035 |

| January 1, 2020 to December 31, 2024 – AC 2060 Approximate Performance vs. Comparable Funds | | | | |
| --- | --- | --- | --- | --- |
| Fund | Approximate Cumulative Return | Approximate Annualized Return | Growth of $1,981,466 | Difference |
| American Century One Choice 2060 Inv/Trust IV | 46.71% | 7.97% | $2,907,049 | $0 |
| American Funds 2060 Trgt Date Retire R4/R6 | 57.04% | 9.45% | $3,111,645 | -$204,596 |
| Vanguard Target Retirement 2060 Fund Inv/Trust II | 54.18% | 9.04% | $3,054,970 | -$147,921 |
| T. Rowe Price Target 2060 Inv/Ret Trust A | 56.54% | 9.38% | $3,101,704 | -$194,655 |
| BlackRock LifePath® Index 2060 Instl/Trust T | 57.92% | 9.57% | $3,129,044 | -$221,995 |

93.    The AC TDF series, expectedly based on its historical metrics, underperformed in all comparable vintages from 2030 to 2060 with regard to returns.

94.    Each of the comparable AC TDF series vintages also underperformed when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.).

95.    Exhibit A to this complaint sets forth the comparison of every comparable vintage of the AC TDF series to the same vintage for available industry leading alternative TDF series options, broken down by performance as compared to the commonly accepted MPT metrics.

96.    The standard of care for selection and monitoring investments for a plan the size of the Plan would require quarterly reviews of the investment performance of selected options. Accordingly, the Plan Fiduciaries would have had a minimum of four opportunities (each quarter in 2019) to remove the AC TDF series based on the 2018 performance and by the Q1 2020 quarterly meeting the Plan Fiduciaries would have had metrics for all of 2018 and 2019 providing the absolute latest time by which the AC TDF series should have been removed.

97.    For each AC TDF vintage, the first table in Exhibit A provides the investment metrics identified throughout this complaint for the two years immediately preceding the Class Period, which was the most up to date data available to the fiduciaries in 2020. If the AC TDF

31

series vintage underperformed, then the metric is highlighted in red. If the AC TDF series vintage outperformed, the metric is highlighted in green and ties are left white. When data is not available the space is left blank. The 2030 vintage comparison against American Funds from Exhibit A is set forth below.

### American Century One Choice 2030 Inv

| ARCVX | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 4.49% | 8.33% |
| 5 - Year Return | 3.83% | 5.94% |
| Sharpe Ratio - 3 - Year | 0.533 | 0.953 |
| Sharpe Ratio - 5 - Year | 0.496 | 0.704 |
| Information Ratio 3 - Year | -1.237 | -1.478 |
| Information Ratio 5 - Year | -0.370 | -0.856 |
| Alpha 3 - Year | -1.02% | -0.71% |
| Alpha 5 - Year | -0.05% | -0.43% |
| Sortino Ratio - 3 - Year | 0.733 | 1.406 |
| Sortino Ratio - 5 - Year | 0.724 | 1.077 |
| Batting Average 3 - Year | 0.306 | 0.333 |
| Batting Average 5 - Year | 0.433 | 0.417 |
| Turnover Ratio | 16.00 | 20.00 |

98.     The second table provides the investment metrics for the comparable vintage benchmark and, as above, if the comparable vintage benchmark outperformed the AC TDF series benchmark, then the metric is highlighted in green, with underperformance highlighted in red and ties left white. The 2030 vintage comparison against American Funds from Exhibit A is set forth below.

32

**American Funds 2030 Trgt Date Retire R4**

| RDETX | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 6.53% | 10.47% |
| 5 - Year Return | 5.26% | 7.71% |
| Sharpe Ratio - 3 - Year | 0.728 | 1.113 |
| Sharpe Ratio - 5 - Year | 0.594 | 0.811 |
| Information Ratio 3 - Year | 0.195 | 0.312 |
| Information Ratio 5 - Year | 0.545 | 0.290 |
| Alpha 3 - Year | 0.33% | 0.55% |
| Alpha 5 - Year | 0.75% | 0.42% |
| Sortino Ratio - 3 - Year | 1.056 | 1.683 |
| Sortino Ratio - 5 - Year | 0.913 | 1.276 |
| Batting Average 3 - Year | 0.611 | 0.611 |
| Batting Average 5 - Year | 0.600 | 0.583 |
| Turnover Ratio | 8.00 | 0.00 |

99.    And finally, the third table provides the difference for each performance metric, with AC TDF series vintage underperformance highlighted in red, outperformance in green, and ties also left green. The 2030 vintage comparison against American Funds from Exhibit A is set forth below.

**American Century One Choice 2030 Inv & American Funds 2030 Trgt Date Retire R4 Comparison**

|  | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 2.03% | 2.14% |
| 5 - Year Return | 1.43% | 1.77% |
| Sharpe Ratio - 3 - Year | 0.195 | 0.161 |
| Sharpe Ratio - 5 - Year | 0.098 | 0.108 |
| Information Ratio 3 - Year | 1.432 | 1.790 |
| Information Ratio 5 - Year | 0.915 | 1.146 |
| Alpha 3 - Year | 1.35% | 1.26% |
| Alpha 5 - Year | 0.80% | 0.85% |
| Sortino Ratio - 3 - Year | 0.323 | 0.277 |
| Sortino Ratio - 5 - Year | 0.189 | 0.200 |
| Batting Average 3 - Year | 0.306 | 0.278 |
| Batting Average 5 - Year | 0.167 | 0.167 |
| Turnover Ratio | -8.00 | -20.00 |
| # of Underperforming Metrics | 13 | 13 |
| # of Total Metrics | 13 | 13 |
| % of Underperforming Metrics | **100%** | **100%** |

100.    As the 2030 comparison example demonstrates, AC TDF 2030 underperformed the American Funds 2030 in all metrics in both 2018 and 2019, which represented the data available to the Fiduciaries in 2020.

101.    Exhibit A to this complaint provides the same charts demonstrating underperformance across the industry leading comparator TDFs across the 2030-2060 vintages.

102.    Thus, a fiduciary following a prudent process would have reviewed at least all the pleaded information in 2020 and would have determined that it was imprudent to continue to retain the AC TDF series and removed it.

103.    Despite all the metrics and performance data imploring the Fiduciaries to remove the underperforming AC TDF series, the Plan Fiduciaries not only failed to remove the AC TDF series prior to the Class Period, but also in 2020 and retained it through at least the end of 2024.

34

104. As a direct result of this conduct, the Plan participants have suffered investment losses of tens of millions of dollars.

## CLASS ACTION ALLEGATIONS

105. Plaintiff brings this action on behalf of himself and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Boyd Gaming or is or was a partner, officer, director, or controlling person of Boyd Gaming; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Boyd Gaming; Plaintiff's counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

106. The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

107. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are suitable to common resolution.

108. Plaintiff's claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

109. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

110. Plaintiff will fairly and adequately represent and protect the interests of the Class.

111. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

112. Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

113. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

114. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

115. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

116. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making

declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants breached their fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

117.   The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

118.   A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

119.   Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and

a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PLAN-WIDE RELIEF

120.    ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). See 29 U.S.C. § 1132(a)(2).

121.    Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. Hughes v. Nw. Univ., 595 U.S. 170, 176-77, 142 S. Ct. 737, 211 L. Ed. 2d 558 (2022).

122.    Plaintiff here seeks relief on behalf of the Plan, i.e., in this case for all losses to the Plan caused by Defendants' breaches, and not only the losses to his individual account.

## TIMELINESS

123.    Within the six-year period prior to Plaintiff's filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

124.    At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

125.    At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

126. Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

**COUNT I: Breach of Fiduciary Duty of Prudence**
**(Against Defendants)**

127. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

128. At all relevant times, the Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

129. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

130. During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

131. At all relevant times during the Class Period, Defendants breached their fiduciary duties of prudence in multiple respects by selecting and continuing to retain a severely underperforming TDF option across all metrics instead of removing it in favor of better and available options.

132. Based on reasonable inferences from the facts set forth in this Complaint, Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the Plan's AC TDF was a prudent

choice for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

133.   During the Class Period, Defendants breached their fiduciary duties of prudence to Plan participants, including Plaintiff, by failing to engage in a prudent fiduciary process for monitoring the Plan's TDF and by failing to remove the imprudent AC TDF investment within a reasonable period.

134.   Defendants were directly responsible for: evaluating and monitoring the Plan's investment options, including the AC TDF, in a prudent fashion; eliminating funds, such as the AC TDF, that underperformed under all metrics; and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

135.   Defendants failed to employ a prudent fiduciary process by failing to monitor and evaluate the AC TDF in comparison to other meaningful benchmark TDFs.

136.   Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

137.   As a result of the Defendants' breach of their fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in unreasonable and unnecessary monetary losses.

138.   Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting

from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

## COUNT II: Failure to Adequately Monitor Other Fiduciaries under ERISA
## (against Boyd Gaming)

139.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

140.   Boyd Gaming had the authority to appoint and remove members or individuals responsible for Plan investment management and was aware that these fiduciaries had critical responsibilities for the Plan.

141.   In light of this authority Boyd Gaming had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

142.   Boyd Gaming had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Boyd Gaming.

143.   Boyd Gaming breached its duty to monitor individuals responsible for Plan investment management, by, among other things:

- Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by maintaining the imprudent AC TDFs for most of the Class Period;

41

Failing to monitor the process by which Plan TDFs were evaluated, failing to investigate the suitability of the AC TDFs based on failing to investigate the availability of alternative, prudent TDFs; and

Failing to remove individuals responsible for Plan investment management whose performance was inadequate in that they continued to maintain the AC TDFs, all to the detriment of the Plan and Plan participants' retirement savings.

144.    As a result of the foregoing breaches of the duty to monitor, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars.

145.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment management. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendants on all claims, and requests that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the firm Milberg, PLLC as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants and compel Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the AC TDFs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and

restoring to the Plan all profits which the Plan participants would have made if the Defendants had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

H. Award pre-judgment and post-judgment interest;

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to 29 U.S.C. § 1132(a);

J. Award such other relief as the Court may deem just and proper;

DATED: February 17, 2026                    Respectfully submitted,

By: */s/ David Hilton Wise*
David Hilton Wise, Esq.
Nevada Bar No. 11014
**WISE LAW FIRM, PLC**
335 W 1st Street
Reno, Nevada 89503
Telephone: (775) 299-4284
Facsimile: (703) 934-6379
Email: dwise@wiselaw.pro

Alexandr Rudenco*
**MILBERG, PLLC**

800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and
the Prospective Class*