DEVERIE J. CHRISTENSEN (State Bar No. 6596)
Deverie.Christensen@jacksonlewis.com
PHILLIP C. THOMPSON (State Bar No. 12114)
Phillip.Thompson@jacksonlewis.com
**JACKSON LEWIS P.C.**
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101
Tel: (702) 921-2460

STACEY C. CERRONE (admitted *pro hac vice*)
Stacey.Cerrone@jacksonlewis.com
**JACKSON LEWIS P.C.**
601 Poydras Street, Suite 1400
New Orleans, LA 70072
Tel: (504) 208-1755

*Attorneys for Defendants Boyd Gaming*
*Corporation and Boyd Gaming Corporation*
*401(k) Plan and Trust Committee*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **MIROSLAV VITEK,**<br>**Individually and on behalf of the**<br>**Boyd Gaming Corporation 401(k) Plan and**<br>**Trust, and on behalf of all the similarly**<br>**situated participants and beneficiaries of**<br>**the plan,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**BOYD GAMING CORPORATION;**<br>**BOYD GAMING CORPORATION 401(k)**<br>**PLAN AND TRUST COMMITTEE; John**<br>**and Jane Does 1-30 in their capacities as**<br>**fiduciaries and members of the Committee,**<br><br>    **Defendants** | Case No.: 2:26-cv-00404-MMD-NJK<br><br><br><br><br><br><br><br>**DEFENDANTS' MOTION TO DISMISS**<br>**CLASS ACTION COMPLAINT** |

Defendants Boyd Gaming Corporation ("Boyd"), the Boyd Gaming Corporation 401(k) Plan and Trust Committee (the "Committee"), and John and Jane Does 1-30 in their capacities as fiduciaries and members of the Committee (collectively, "Defendants"), through undersigned

counsel, move to dismiss Miroslav Vitek's ("Plaintiff") Complaint with prejudice under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.  This Motion is based on the following Memorandum of Points and Authorities, all pleadings and documents on file with the Court, and any oral argument that the Court deems proper.

DATED this 30th day of April 2026.

**JACKSON LEWIS P.C.**

*/s/ Phillip C. Thompson*
Stacey C. Cerrone (admitted *pro hac vice*)
Stacy.Cerrone@jacksonlewis.com
601 Poydras Street, Suite 1400
New Orleans, LA 70072
Tel: (504) 208-1755

Deverie J. Christensen (NV Bar #6596)
Deverie.Christensen@jacksonlewis.com
Phillip C. Thompson (NV Bar #12114)
Phillip.Thompson@jacksonlewis.com
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101

*Attorneys for Defendants*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION AND SUMMARY OF ARGUMENT.

Over the last four years, opportunistic plaintiffs have filed more than 230 cookie-cutter class actions against 401(k) plans under the Employee Retirement Income Security Act of 1974 ("ERISA").  The script is familiar.  With the benefit of hindsight, plaintiffs criticize the plan's fiduciaries for selecting investment options which provided lower returns than potential alternatives over a cherry-picked period of time.  Plaintiffs demand that courts open the door to multi-million-dollar class action discovery, imposing a substantial financial burden on Defendants, based on nothing more than the existence of investments which performed better over a certain period of time, with no other evidence or allegations that Defendants acted imprudently.

2

Defendants do not possess a crystal ball. The mere fact that an investment fund suffered from a period of underperformance does not indicate that it will continue to underperform in the future or that Defendants failed to make reasoned decisions with respect to the fund.

The Complaint follows the same, flawed playbook. Plaintiff alleges that Defendants breached ERISA's fiduciary duty of prudence by retaining the American Century One Choice target date fund series ("AC TDFs") because they underperformed certain benchmarks for some period of time.[1] But Plaintiff's investment claims are unsupported by allegations sufficient to survive the rigorous, context-specific inquiry set forth by the Supreme Court in *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) that District Courts must apply to glean a plausible inference of an ERISA violation. The AC TDFs are managed by a sophisticated team, including a Chief Investment Officer with more than 40 years of industry experience with a bachelor's degree in Finance from Wharton and an MBA from the University of Chicago, two Senior Portfolio Managers and Certified Financial Advisors, and a Head of Research for Multi-Asset Strategies with a Ph. D. in finance from NYU. Plaintiff's sole theory, that Defendants acted imprudently by exercising patience instead of second-guessing the investment managers and selling off the AC TDFs at short-term lows, is not cognizable as a matter of law.

The Complaint is predicated on superficial, hindsight-based allegations that other investments in the marketplace were cheaper and performed better. Generic allegations of this variety are insufficient to state a claim for relief under ERISA. When the Court undertakes the required, context specific analysis required for these claims, the truth becomes clear: Plaintiff's Complaint lacks merit and should be dismissed under Fed. R. Civ. P. 12(b)(6).

## II.     FACTUAL BACKGROUND AND PLAINTIFF'S CLAIMS.

### A.     The Plan and Plaintiff's Participation.

To provide benefits to its employees, Boyd sponsors the Boyd Gaming Corporation 401(k) Plan and Trust ("the Plan"), a "defined contribution plan" under 29 U.S.C. § 1002(34). ECF NO.

---

[1] Plaintiff also alleges that the AC TDFs were too expensive, but that allegation is duplicative because the funds' expenses are already factored into their performance and returns.

1 at ¶¶ 7-8, 18. Participants' retirement benefits are determined by the value of their individual accounts, which consist of employee and employer contributions plus any investment gains and less investment expenses. *Id*., ¶ 2. As alleged in the Complaint, Defendants served as the Plan administrator under 9 U.S.C. § 1002(16); parties in interest under 29 U.S.C. § 1002(14)(A); or Plan fiduciaries under 29 U.S.C. § 1002(21)(A), with responsibility for overseeing the Plan, including the selection and retention of Plan investments. *Id.*, ¶ 19.

Plaintiff alleges he is a former Boyd employee and Plan participant who invested in the AC TDFs challenged in the Complaint. *Id.*, ¶ 13. He purports to bring this lawsuit under 29 U.S.C. § 1109 on behalf of a class defined as:

> Participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Boyd Gaming or is or was a partner, officer, director, or controlling person of Boyd Gaming; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Boyd Gaming; Plaintiff's counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

*Id.* ¶¶ 4, 105.

## B.      The Plan's Target-Date Funds and Fund Management Team.

In accordance with ERISA § 404(c), 29 U.S.C. § 1104(c), the Plan offers a "broad range" of investment options spanning the full risk spectrum and covering all major asset classes. *See* 29 C.F.R. § 2550.404c-1(b)(1)(ii). Included in the Plan's investment lineup are the AC TDFs, a series of target-date funds designed for investors who prefer a one-stop investment instead of actively managing their retirement savings. ECF No. 1, ¶¶ 27-29.

As their name suggests, target-date funds are designed for a participant to invest in a fund based on his or her target retirement date, known as the fund's "vintage." *Id.*, ¶ 28. For example, "the fund…for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage." *Id.* Each vintage has a tailored portfolio of underlying holdings that gradually shifts to become more conservative as the "target" retirement year approaches. *Id*., ¶ 33. During

4

the putative class period,[2] the Plan included at least ten different AC TDF vintages covering five-year periods from 2025 through 2065 as well as a "retirement" vintage for participants who have reached their target date.  *See* Declaration of Phillip Thompson ("Thompson Decl."), Exs A-E, Form 5500 Filings for the Years 2020-2024.[3]

A target-date fund's initial asset allocation—when the target retirement date is decades away—consists mostly of equity investments, which have greater potential for higher returns but can be more volatile and carry greater investment risk.  ECF No. 1 at ¶ 33.  As the target retirement date approaches (and sometimes even after that date arrives), the asset allocation shifts to include a higher proportion of more conservative investments, such as bonds and cash instruments, which generally are less volatile and carry less investment risk than equities.  *Id.*  The shift in asset allocation over time is called the fund's "glide path."  *Id.*

---

[2] Plaintiff alleges a putative class period of "six years prior to the date of the filing of [the] Complaint through the date of judgment," which places the start of the putative class period on February 17, 2020.  Compl., ¶ 106.

[3] This Court may consider "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice" when deciding Defendants' Motion to Dismiss.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Pursuant to Fed. R. Evid. 201(b)(2), the Court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Courts have routinely extended judicial notice to retirement plans' IRS Form 5500 Annual Reports and investments' SEC filings in ERISA disputes.  *See, e.g., Smith v. VCA, Inc.*, 2022 U.S. Dist. LEXIS 103585, at *5 (C.D. Cal. Apr. 6, 2022) (court may take judicial notice of Form 5500s on motion to dismiss); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1067 (N.D. Cal. 2017) ("Courts routinely take judicial notice of ERISA plan documents like those at issue here.").  Courts have also considered publicly available investment fund information and studies.  *See, e.g., Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 U.S. Dist. LEXIS 26227, at *9 (N.D. Cal. Feb. 9, 2021) (granting judicial notice of Form 5500 filings and a "401k Averages Book" study referenced in Complaint as a market comparator); *see also Meiners v. Wells Fargo & Co.,* 898 F.3d 820, 823 (8th Cir. 2018) (holding that district court appropriately considered information from publicly available prospectuses for investments challenged in a complaint).  Accordingly, Defendants ask that this Court consider the publicly available Form 5500 filings, investment fund manager information, and fund performance study  attached as exhibits to the Declaration of Phillip C. Thompson, which is appended to Defendants' Motion to Dismiss.

Glide paths are often categorized as "to," meaning the fund reaches its most conservative point at the target retirement date, or "through," meaning the fund reaches its most conservative point after the target date. *Id.*, ¶ 35. The AC TDFs are "to retirement" funds. *Id.*, ¶ 36. But, as Plaintiff recognizes in the Complaint, target-date funds managed by different investment companies have markedly different strategies and hold different equities, bonds, and other assets, in varying proportions, regardless of their official categorization. *See id.*, ¶¶ 36, 44, 50, 58-59.

The AC TDFs are managed by a sophisticated, 5-member team of professionals who curate the portfolio of holdings for each vintage, consisting of Richard Weiss, Scott Wilson, Vidya Rajappa, and Radu Gabudean. *See* Thompson Decl., Ex. F, printout from the publicly accessible website   https://www.americancentury.com/invest/funds/one-choice-2050-portfolio/arfvx/.   Mr. Weiss is the Chief Investment Officer for Multi-Asset Strategies. He has worked in the industry since 1984 and holds a bachelor's degree in Finance from the Wharton School of the University of Pennsylvania as well as a master's degree in Business Administration from the University of Chicago Booth School of Business. He has authored several academic papers and is well known for his advanced work in the field of global investing. *Id.*, Ex. G, printout from the publicly accessible website  https://www.americancentury.com/bio/r-weiss/.

Mr. Gabudean is a Senior Portfolio Manager and Head of Multi-Asset Research. He has worked in the industry since 2001, and earned his Ph.D. in finance from the Stern School of Business at New York University and a bachelor's degree in economics from York University in Toronto, Ontario. He has published a number of papers on asset allocation and related topics such as risk premia, correlation forecasting and volatility forecasting. *Id.*, Ex. H, printout from the publicly accessible website.  https://www.americancentury.com/bio/r-gabudean/.

Ms. Rajappa is a Vice President, Senior Portfolio Manager, and Head of Portfolio Management, Multi-Asset Strategies. She began in the industry in 1995 and holds a master's degree in statistics and operations research from New York University. She is a CFA charter holder and member of the CFA Institute. *Id.*, Ex. I, printout from the publicly accessible website

https://www.americancentury.com/bio/v-rajappa/.  Mr. Wilson is a Vice President and Senior Portfolio Manager.  He entered the industry in 1992 and holds a bachelor's degree in business administration from Pepperdine University.  He is also a CFA charter holder and a member of the San Francisco Society of Financial Analysts.  *Id.*, Ex. J, printout from the publicly accessible website https://www.americancentury.com/bio/s-wilson/.

### C.    Plaintiff's Claims.

Plaintiff asserts two Counts under ERISA, both based on Defendants' retention of the AC TDFs as Plan investment options during the putative class period.  *Id.*, ¶¶ 127-145.  In Count I, Plaintiff alleges that Defendants breached their duty of prudence under ERISA by "failing to engage in a prudent fiduciary process for monitoring the [AC TDFs] and by failing to remove the imprudent [AC TDFs] within a reasonable period" in light of their alleged underperformance relative to four other target-date investment options: 1) the American Funds Target Date Retirement Series R4/R6, 2) the Vanguard Target Retirement Series Inv/Trust II, 3) the T. Rowe Price Target Series Inv/Ret Trust A, and 4) the Blackrock Lifepath Index Instl/Trust T (collectively "Comparator TDFs").  *Id.*, ¶¶ 67-68, 82-85, 92, 97-99, ¶¶ 131-133.

In Count II, Plaintiff alleges that, based on the purported acts of imprudence alleged in Count I, Boyd breached its fiduciary duty to monitor the individual fiduciaries "responsible for investment management."  *Id*., ¶¶ 140-143.

Defendants submit that both counts should be dismissed under Rule 12(b)(6).

## III.    LEGAL STANDARD.

### A.    Standard for Motions to Dismiss Erisa Claims Under Rule 12(b)(6).

Under the pleading standards set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a complaint must "state a claim to relief that is plausible on its face." *Twombly* 550 U.S. at 570 (emphasis added).  To determine plausibility, the court begins by stripping out conclusory statements, which are not entitled to a presumption of truth, then evaluates whether the well-pled factual allegations that remain (if any) plausibly give

rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679. A plaintiff who establishes only "conceivable" or "possible" misconduct has not "nudged his claims…across the line" to plausibility." *Id*.

The Twombly/Iqbal pleading standard applies with equal force to ERISA 401(k) class actions. *See Hughes*, *v*142 S. Ct. at 742. The Supreme Court holds that, in the ERISA context, a motion to dismiss is an "important mechanism for weeding out meritless claims*." Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). The Supreme Court obliges other courts to recognize the wide range of reasonable choices that fiduciaries can make when those courts evaluate fiduciary decisions, and necessarily requires a "context specific" inquiry at the motion to dismiss stage.". *Hughes*, 142 S. Ct. at 742; *see also Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021 (9th Cir. 2025) ("At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise") (quoting *Hughes*, 142 S. Ct. at 742), *cert. granted*, 223 L.Ed.2d 553 (U.S. 2026).

**B.     Standard for ERISA'S Duty of Prudence.**

The duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This duty pertains to the methods employed by the fiduciary, not the results they have achieved. *Anderson*, 137 F.4th at 1021. Thus, courts must apply an objective standard that judges the fiduciary's methods based on information available at the time of each decision, not on the basis of hindsight. *Id.* ("ERISA requires prudence, not prescience") (quoting *Debruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)).

Thus, it is not enough for a plaintiff to allege that a fiduciary "could have obtained better results—whether higher returns, lower risks, or reduced costs—by choosing other investments." *Id.* Instead, a plaintiff must either allege "facts that would directly show that the fiduciaries

employed unsound methods in making their investment decisions" or "circumstantial factual allegations from which the court may reasonably infer from what is alleged that the process was flawed." *Id.* at 1021-22 (internal quotes omitted). The key to stating a plausible claim under the latter approach, which Plaintiff attempts, is providing "a sound basis for comparison—a meaningful benchmark" for the challenged investment, which Plaintiff fails to do. *Id*. at 1021-22 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022)).

## IV.     LEGAL ARGUMENT.

### A.     Plaintiff Fails to State a Claim for Imprudence Related to Investment Performance.

Plaintiff does not – and cannot - impugn Defendants' fiduciary process for the selection or retention of investments, which is required to properly state a claim upon which relief could be granted. Instead, Plaintiff attempts to create an inference of imprudence from circumstantial allegations of underperformance according to Plaintiff's chosen metrics (*see* Compl., ¶¶ 67-100), which is entirely insufficient to survive this motion. *Anderson*, 137 F.4th at 1021.

But Plaintiff's allegations are little more than cherry-picked criticism in hindsight, completely unsupported by allegations of fact to demonstrate the significance of the metrics or differences in performance. Additionally, Plaintiff has not alleged sufficient facts to demonstrate that the alternative target-date funds serve as "meaningful benchmarks" for the challenged AC TDFs. In the absence of these allegations, Plaintiff has failed to assert a plausible claim for relief. *See Anderson*, 137 F.4th at 1021.

### 1.     Plaintiff's Metrics and Comparisons Are Fundamentally Flawed.

Allegations that a fund's "costs are too high, or returns are too low" are insufficient to survive a motion to dismiss. *Id.* at 1022 (quoting *Matousek* at 278). Rather, a plaintiff is required to provide a "***sound basis for comparison***" through a "meaningful benchmark." *Id.* (emphasis added). To satisfy this standard, Plaintiff must identify relevant ***comparators*** with similar objectives to the AC TDFs, and he must also take into consideration the risk of loss and opportunity for gain compared to the opportunity for gain associated with reasonably available alternatives

with similar risks. *Id.* (citing 29 C.F.R. § 2550.404a-1(b)(2)(i)). In other words, Plaintiff must show, relying only on data available to the fiduciaries at the time of their challenged decisions, that another fund with similar objectives had lower risks and more opportunity for gain. Moreover, the differences must be significant in scope. *See, e.g. Abel v. CMFG Life Ins. Co.,* No. 22-cv-449-wmc, 2024 U.S. Dist. LEXIS 14535, at *16 (W.D. Wis. Jan. 26, 2024) (explaining that "district courts around the country have rejected breach of fiduciary duty claims based on [narrow] underperformance metrics, finding alleged, short-term differences in performance of between 1.14 to 4.4% immaterial"). Plaintiff's Complaint falls far short of the required standard.

First, Plaintiff fails to provide a "sound basis for comparison." He asks the Court to judge the AC TDFs under a set of fourteen cherry-picked metrics: three and five-year returns, three and five-year Sharpe Ratio, three and five-year Information Ratio, three and five-year Alpha, three and five-year Sortino Ratio, three and five-year Batting Average, Turnover Ratio, and Net Expense Ratio. ECF No. 1, ¶ 67. But each of the charts in Plaintiff's Complaint relies on undefined methodologies and binary measurements that obfuscate the underlying data. He does not set forth a sound basis for comparison because he fails to explain why he chose to include certain metrics or why he rejected others, what 674 metrics he allegedly analyzed, or how they were computed. Moreover, he makes no attempt to allege that the various ratios and short-term returns set forth in his Complaint indicate the risks of loss or opportunities for gain moving forward (because they do not).

For example, in Paragraph 67 of the Complaint, Plaintiff alleges that the AC TDFs underperformed in thirteen distinct categories relative to "industry leading available alternative target date series." ECF No. 1 at ¶ 67. But the chart does not actually convey the performance of the AC TDFs or the "industry leading" alternatives in those thirteen categories. Instead, the chart records the number and percentage of "metrics the [AC TDFs] underperformed," without ever defining or explaining these terms. Looking at the first category of "3-year returns," for example, Plaintiff does not explain whether the fifty-five "metrics examined against comparators" refer to

fifty-five periods of data or data from fifty-five alternative funds.  In either case, neither the time periods nor the alternative funds are specified, which renders these categories meaningless.  The Court simply cannot conclude from these allegations that Plaintiff has set forth a sound basis for comparison.

Additionally, many of Plaintiff's charts misleadingly equate all instances of underperformance or overperformance without regard for the size of the performance gap.  In fact, a closer look at the performance data for the specific vintages of the AC TDFs, *see* ECF No. 1., ¶ 92, shows that the AC TDFs' annual returns lagged behind Plaintiff's proposed alternatives by only a few percentage points, which is insufficient to support a claim under ERISA.  *See Abel* at *16 (collecting cases and dismissing claims premised on relative underperformance because the performance gap, ranging from 0.2% to 5%, was not significant).

But Even if Plaintiff's performance allegations were free of ambiguity and significant in scope, Plaintiff's cherry-picked measurements cannot support plausible allegations of imprudence on their own.  As noted above, Plaintiff must compare the AC TDFs against alternative funds with similar objectives.  *See Anderson*, 137 F.4th at 1022; *Matousek*, 51 F.4th at 278; 29 C.F.R. § 2550.404a-1(b)(2)(i).  Different funds have different strategies, and those strategies may result in differences in performance under various market conditions.  *Anderson* at 1021; *see also Phillips v. Cobham Advanced Elec. Sols., Inc.* (*Phillips I*), No. 23-cv-03785-EKL, 2025 U.S. Dist. LEXIS 184960, at *16 (N.D. Cal. Sep. 19, 2025) ("In years when the equity market is hot, a more aggressive target date fund that retains equities longer will appear to outperform a fund that shifts toward more conservative assets like bonds sooner. But that snapshot does not mean it is objectively imprudent to adopt a more conservative strategy — the tables turn when the market is down.") (quoting *Pizarro v. Home Depot, Inc.,* 111 F.4th 1165, 1180 (11th Cir. 2024)). Because a period of relative underperformance may be attributed to fundamental differences in strategy, a plaintiff cannot rely on arbitrary comparisons to state a plausible claim.  *Id.*

Plaintiff erroneously contends that his charts demonstrate a breach of the standard of care because several of the included ratios reflect risk-adjusted performance, which he claims a prudent fiduciary must consider. ECF No. 1 at ¶¶ 54, 55. But the Ninth Circuit rejected this theory in *Anderson*, holding that the pleading standard cannot be circumvented by appeals to "risk-adjusted" analyses because an "ERISA plaintiff cannot make incomparable funds comparable simply by using a ratio." *Anderson*, 137 F.4th at 1025.

In short, Plaintiff's allegations and charts setting forth cherry-picked performance data, risk-adjusted analyses, and various ratios are exactly the kinds of assertions which courts routinely reject. The Court should dismiss Plaintiff's claim for breach of fiduciary duty on the same basis.

**2.      Another Court in the Ninth Circuit Recently Dismissed Claims Challenging the Same AC TDFs Which Plaintiff Challenges Here Based on Hindsight Performance Comparisons.**

Unsurprisingly, another court recently dismissed a nearly identical claim of imprudence based on the alleged underperformance of the same funds at issue here. *See Phillips v. Cobham Advanced Elec. Sols., Inc.* (*Phillips II*)*,* No. 23-cv-03785-EKL, 2025 U.S. Dist. LEXIS 184960, at *36 (N.D. Cal. Sep. 19, 2025) (applying the principles outlined above and rejecting the plaintiff's challenge to the plan fiduciaries' decisions to select and retain the AC TDFs).

In *Phillips II*, the plaintiffs alleged that the AC TDFs underperformed relative to a peer group of target-date funds categorized by the investment research company Morningstar and the S&P target-date index. *Id*. at *13-14. The plaintiffs further alleged that the funds carried higher fees and had worse "Beta," a measure of systemic risk under modern portfolio theory, than other target-date investments on the market. *Id.* at *14, 22.

Having rejected the plaintiff's proffered comparators, the *Phillips II* court held that the plaintiffs' broad assertions of underperformance relative to its Morningstar peer group could not support a plausible claim. *Id.* at *14-15. The court explained that the purported peer group included a variety of different target-date investment alternatives "that may employ different risk mitigation strategies and objectives" which might explain differences in performance under

depending on market conditions. *Id.* at \*14-15.  In the case of the AC TDFs, the fund managers had adopted a strategy of sacrificing growth during market upturns to minimize losses during downturns, a strategy that actually caused the AC TDFs to outperform "the Morningstar peer group median every other year between 2017 and 2023." *Id.* at \*15-16.  Thus, the court ruled that the plaintiffs had not plausibly asserted a claim of imprudence by alleging the AC TDFs underperformed relative to the overall marketplace of target-date funds. *Id.* at \*17.

The court found the plaintiffs' allegations regarding the AC TDFs Beta ratio and underperformance relative to the S&P target-date index to be similarly insufficient. *Id.* at \*17-18, 22-24.  As the court noted, the index itself could not serve as a meaningful benchmark because it was not a fund in which the plan could have invested, and other target-date funds' performances relative to that index were irrelevant because the plaintiff had not established that those other funds were meaningful benchmarks. *Id.* at \*17-18.  Similarly, the court held that the mere fact that some target-date funds were cheaper or carried different levels of risk - represented by different Beta scores - than the AC TDFs did not render those investments more or less prudent options. *Id.* at \*22-24.  In the absence of meaningful benchmarks, none of these allegations were sufficient to support a plausible claim. *Id.* at \*36.

Here, like the plaintiffs in *Phillips II*, Plaintiff asks the Court to infer imprudence from mere underperformance of the AC TDFs. *See* ECF No. 1 at ¶¶ 131-132 (alleging that "Defendants breached their fiduciary duties of prudence . . . by selecting and continuing to retain a severely underperforming TDF option . . . [b]ased on reasonable inferences from the facts set forth in the Complaint").  Like the *Phillips II* plaintiffs, Plaintiff relies largely on conclusory comparisons to other target-date funds, chosen not because of their similarity to the challenged investment, but simply because they are well-known target-date funds. *Id.* at ¶ 76 (explaining that the comparator TFDs were included because they are "established industry leaders, and among the top 5 most selected options that any prudent fiduciary would be aware of").  Just as the *Phillips II* plaintiffs' assertions were deemed insufficient to support an inference of imprudence in the absence of

meaningful benchmarks, this Court should dismiss Plaintiff's claim for breach of fiduciary duty for the same reason.

### 3.    Plaintiff's Chosen Comparators are Not Meaningful Benchmarks.

Even setting aside the myriad issues with Plaintiff's alleged metrics, Plaintiff has not alleged facts demonstrating that the Comparator TDFs are "meaningful benchmarks" for the AC TDFs. *Anderson*, 137 F.4th at 1022. As noted above, Plaintiff selected five comparator TDFs on the basis that they "are established industry leaders" and "among the top 5 most selected options." ECF No. 1 at ¶ 76. But a fund's popularity is not among the factors a Court should analyze in determining whether a comparator is meaningful. *Id.*

Indeed, the Complaint contains *no* factual allegations regarding the Comparator TDFs' asset allocations, risk tolerances, underlying management philosophies or processes, or glide paths, including whether they utilize a "to retirement" or "through retirement" glide-path strategy. This omission is fatal to Plaintiff's claims. *Anderson*, 137 F.4th at 1025.

The Ninth Circuit has unambiguously held that plaintiffs attempting to create an inference of imprudence on the basis of a chosen investment's costs or performance must provide a sound basis of comparison, a "meaningful benchmark," in the form of an alternative investment with similar objectives, strategies, and risk profiles. *Anderson*, 137 F.4th at 1022; *see also* Wehner, 2021 WL 2417098, at *8 (a complaint must contain "factual allegations that compare the products' styles and strategies to support a finding of 'meaningful benchmark'"). Courts around the country have arrived at the same conclusion; after all, funds with different strategies and holdings should be expected to perform differently. *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022); *Meiners v. Wells Fargo & Co.,* 898 F.3d 820, 822-23 (8th Cir. 2018); *Matney v. Barrick Gold of N. Am.,* 80 F.4th 1136, 1153 (10th Cir. 2023); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 582 (7th Cir. 2022); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022); *Boyette v. Montefiore Med. Ctr.* (*Boyette III*)*,* No. 24-1279-cv, 2025 U.S. App. LEXIS 391, at *3-4 (2d Cir. Jan. 8, 2025); *Sweda v. Univ. of Pa.,* 923 F.3d 320, 332 (3d Cir. 2019).

In *Anderson v. Intel Corp. Investment Policy Committee*, for example, the Ninth Circuit affirmed the dismissal of a complaint that lacked meaningful comparators to support its claims of imprudence premised on underperformance of target-date funds  137 F.4th at 1027.[4]  There, the plaintiff alleged that the defendant fiduciaries had violated their duties of prudence and loyalty under ERISA by, *inter alia*, investing in target-date funds that underperformed relative to published financial indices and Morningstar categories of peer-group funds.  *Id*. at 1020.  But although the plaintiff asserted that his chosen comparators were meaningful benchmarks for the challenged funds, he failed to allege details sufficient to support that inference.  *Id.* at 1023.  In fact, the comparators and challenged funds differed substantially in terms of asset allocation, with the challenged funds favoring non-equities to minimize risks while several of the comparators favored equities to maximize growth.  *Id.*

Accordingly, the court held that the plaintiff had failed to allege meaningful comparators for the challenged funds.  *Id*.  As the court explained, it is not enough for a plaintiff to simply declare that a comparator is "comparable" to or "a peer" of a challenged investment; a plaintiff must identify comparators that share the same objectives and design as the challenged funds.  *Id.* In the absence of such allegations, the court affirmed the dismissal of the plaintiff's claims.  *Id*. at 1026.

Moreover, as noted above, the *Phillips II* court recently rejected nearly identical comparators for the AC TDFs. 2025 U.S. Dist. LEXIS 184960, at *18-22.  There, the plaintiffs identified a total of seven comparator target-date investments, including the American Funds Target Date Retirement Series and the T. Rowe Price Target Series—two of the four Comparator TDFs listed in Plaintiff's Complaint.  *Id.* at *19.  The plaintiff insisted that these funds were suitable comparators for the AC TDFs merely because they fell under the same "Morningstar Category," were large blend style funds, and were at least somewhat actively managed.  *Id.*

---

[4] This decision is currently pending review by the United States Supreme Court, which has granted the plaintiff's petition for writ of certiorari.  *See Anderson*, 223 L.Ed.2d 553 (U.S. 2026).

The court rejected the plaintiffs' proffered comparators, finding that "these features are common to most, if not all, target date funds" and rejected the plaintiffs' underlying presumption that any target-date fund may serve as a meaningful comparator for another. *Id.* at \*19. Illustrating its point, the court noted that the AC TDFs allocated substantially less of their assets to equities when compared to the proffered comparators, an asset allocation that reflected "fundamentally different investment strategies and risk preferences" among the funds. *Id.* at \*19-20. The court also noted that only one of the proffered comparators, the Voya Target Retirement Fund, shared a "to" glide path with the AC TDFs; the other six comparators used "through" glide paths that were designed with a different strategy in mind. *Id.* at \*20-21. Ultimately, because the plaintiffs had failed to establish meaningful benchmarks for the AC TDFs, the court dismissed their complaint with prejudice. *Id.* at \*13-29.

Plaintiff, like the plaintiffs in *Anderson* and *Philips*, alleges no factual similarities between the comparator TDFs and the AC TDFs beyond their shared status as target-date funds. The Complaint contains no allegations regarding the funds' goals, objectives, or strategies, such as intentionally sacrificing growth during market upturns to minimize losses during downturns. *See generally* Plaintiff's Complaint, ECF No. 1. Rather, Plaintiff simply alleges that the comparator funds were well-known and Plaintiff did not choose "fringe or unproven peers for comparison." *Id.* at ¶ 76. This is no minor omission; Plaintiff's own allegations confirm that consideration of a target-date fund's asset allocations, risk factors, management strategies, and glide path fall under the "minimum standard of care with respect to the selection and retention of [a] target date series." ECF No 1 at ¶ 49-51. Yet Plaintiff makes no attempt to compare the glidepaths or management strategies of the funds. In the absence of such information, the Complaint fails to establish a meaningful benchmark for the AC TDFs, and this Court should follow the examples of *Anderson* and *Phillips* by dismissing Plaintiff's claims of imprudence in their entirety.

**4.    A Retrospective Review of a Period of Underperformance Alone Does Not Require a Fiduciary to Sell the Fund.**

As discussed above, Plaintiff's claims rest solely on his allegations that the AC TDFs underperformed similar funds available to the Plan leading up to and during the proposed class period.  But these allegations, even if true, do not support an inference that Defendants breached their fiduciary duties of prudence by deciding to retain the funds.  Indeed, the United States Securities and Exchange Commission prohibits investment companies from "implying that future gains or income may be inferred from or predicted based on past investment performance" because such a statement would be misleading.  *See* 17 CFR § 230.156.  This is to prevent investors from making decisions based on a belief that historical returns of funds will continue in the future.

The SEC has good reason for this regulation.  In January 2020, Yale Professor of Finance James Choi and finance doctoral student Kevin Zhao published a study finding that, from 1994 to 2018, a fund's past performance is completely unpredictive of its returns in the future.  *See* Thompson Decl., Ex. K, a copy of the study which is publicly available at https://spinup-000d1a-wp-offload-media.s3.amazonaws.com/faculty/wp-content/uploads/sites/27/2020/01/Performance-persistence-2020.01.22b.pdf.  As described in the study, in any given year, the best-performing funds from the from the previous year are no more likely than the worst-performing funds from the previous year to post higher returns in the future.

Despite the SEC regulation and aforementioned study, Plaintiff claims that "[t]he standard of care for selection and monitoring investments" required Defendants to remove the AC TDFs in 2019 "based on the 2018 performance" of the funds. ECF No. 1 at ¶ 96.  Obviously, there is no rational basis to find that the standard of care should include this requirement.  Further, basic math and logic dictate that, over any given period, 50% of target date funds perform below median, 25% perform in the lowest 25th percentile, and 10% perform in the lowest 10th percentile.  Under Plaintiff's theory, some Plan fiduciaries must always be liable for imprudence because some TDFs must always be at the bottom in terms of past performance over any given period, no matter where the line is drawn.  Obviously, this cannot be the law.

Plaintiff's Complaint demonstrates the logical flaw of relying on cherry-picked performance data. All he has done is identify which funds, in hindsight, generated lower returns in comparison to potential alternatives leading up to and during the proposed class period, and sued fiduciaries of one or more of the plans offering those funds. But at any given time during the class period, there was no way for the Plan fiduciaries to know that the AC TDFs would continue to underperform certain peers. Despite underperformance in any prior trailing period, the AC TDFs were just as likely as the proposed comparators to generate higher returns in the future. As noted above, the AC TDFs were managed by a sophisticated, experienced team of professionals with a history of success in the industry. But even the most talented investors cannot guarantee the highest returns. The mere fact that a fund underperforms over a period of time does not make investors in the fund imprudent.

In fact, the opposite is true. The investment strategy Plaintiff suggests, routinely selling funds following periods of underperformance in order to purchase alternative funds which have substantially increased in value over the same time, virtually guarantees lower returns. As the Sixth Circuit pointed out in affirming dismissal of similar investment performance claims, this sell low, buy high methodology "is one of the surest ways to frustrate the long-term growth of a retirement plan." *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022). Accordingly, "[m]erely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty." *Id.*

This analysis applies equally here. Defendants' patience with an investment fund does not demonstrate imprudence. Plaintiff alleges no facts to suggest that Defendants failed to engage in a reasoned decision-making process simply because they did not allow past performance to dictate their investment decisions moving forward. Instead, Plaintiff only asks the Court to infer imprudence based on the AC TDF's alleged underperformance. *See* ECF No. 1 at ¶¶ 131-132

18

(alleging that, "[b]ased on reasonable inferences form the facts set forth in this Complaint," Defendants "breached their fiduciary duties of prudence . . . by selecting and continuing to retain a severely underperforming TDF option"). Yet, as the *Smith* court held, alleging underperformance via mere comparison to a better-performing fund does not suffice to plausibly plead an imprudent decision. *Smith*, 37 F.4th at 1166. Accordingly, the Court should dismiss Plaintiff's claim for breach of fiduciary duty of prudence for failure to allege sufficient facts to support the claim.

**B.    Plaintiff Fails to State a Derivative Claim for Failure to Monitor.**

The Ninth Circuit has held that derivative claims premised on a fiduciary's alleged failure to monitor other fiduciary's conduct cannot stand in the absence of plausible underlying allegations of fiduciary misconduct. *See Davis v. Salesforce.Com, Inc.,* No. 21-15867, 2022 U.S. App. LEXIS 9527, at *5 (9th Cir. Apr. 8, 2022); *White v. Chevron Corp.,* 752 F. App'x 453, 455 (9th Cir. 2018; *see also Anderson*, 137 F.4th at 1019-20 (affirming dismissal of derivative claims following appropriate dismissal of underlying claims of fiduciary imprudence). Here, for the reasons set forth above, Plaintiff has not established plausible underlying claims of fiduciary imprudence. Therefore, the derivative claims asserted in Plaintiff's Count II must be dismissed under well-established Ninth Circuit precedent.

**V.    CONCLUSION.**

For all the reasons discussed above, the Court should dismiss the Complaint in its entirety.

Dated:  April 30, 2026.

**JACKSON LEWIS P.C.**

*/s/ Phillip C. Thompson*
Stacey C. Cerrone (admitted *pro hac vice*)
Stacy.Cerrone@jacksonlewis.com
601 Poydras Street, Suite 1400
New Orleans, LA 70072
Tel: (504) 208-1755

Deverie J. Christensen (NV Bar #6596)
Deverie.Christensen@jacksonlewis.com
Phillip C. Thompson (NV Bar #12114)
Phillip.Thompson@jacksonlewis.com
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

WISE LAW FIRM, PLC
David Hilton Wise, Bar # 11014
335 W 1st Street
Reno, Nevada 89503

MILBERG, PLLC
Alexandr Rudenco, Esq.*
800 S. Gay St, Suite 1100
Knoxville, TN 37929

Attorneys for Plaintiff

*/s/ Phillip C. Thompson*
Phillip C. Thompson

4919-3521-7571, v. 1

21